IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| Quality Woodwork Interiors, Inc., | § | Case No. 05-35214 |
|    Debtor. | § | (Chapter 7) |
| | § | |
| Quantum Designworks, L.C. | § | Case No. 05-35299 |
|    Debtor. | § | (Chapter 7) |
| | § | |
| | § | (Jointly Administered Under |
| | § | Case No. 05-35214) |

## MEMORANDUM OPINION

Quality Woodwork Interiors, Inc. ("Quality") filed chapter 11 bankruptcy on April 5, 2005. Its affiliate, Quantum Designworks, L.C. ("Quantum") filed chapter 11 bankruptcy on April 6, 2005 (collectively, "Debtors" or "Quality"). On April 6, 2005, the Court ordered the two cases jointly administered.

Immediately upon the filing of the first petition, Amegy Bank National Association ("Amegy") filed a motion to prohibit Quality's use of cash collateral and inventory. On April 6, 2005, the Debtors filed a motion for authority to use cash collateral. Following hearings on April 6 and 8, 2005, the Court issued an Order Authorizing Limited Use of Cash Collateral and Payment of Prepetition Payroll Obligations and Denying Motion to Prohibit Debtors' Use of Inventory (the "Cash Collateral Order"). On April 18, 2005, the Court held an emergency status hearing regarding the parties' compliance with the Cash Collateral Order. At this hearing, the Debtors and Amegy each advised the Court of their requested relief. Neither party, however, had filed written pleadings requesting relief. Accordingly, the Court directed the parties to file motions setting forth their requested relief. The Debtors filed an Amended Motion to Use Cash Collateral [docket no. 52] and Amegy filed a Motion to Convert [docket no. 54].

1

The Court conducted a hearing on these motions on April 19, 2005, and announced its decision and preliminary findings of fact and conclusions of law. By separate order issued April 20, 2005, the Court denied the Debtors' Amended Motion to Use Cash Collateral and granted Amegy's Motion to Convert. Pursuant to Bankruptcy Rule 7052, the following Memorandum Opinion constitutes the Court's findings and conclusions. To the extent any purported findings are properly characterized as conclusions, they should be considered as such; to the extent that any conclusions are properly characterized as findings, they should be considered as such.

### Findings of Fact

The Court's findings of fact are based on the testimony and exhibits from the April 19, 2005 hearing and the evidence taken at the previous hearings in this case.

a. <u>The Debtors' financial condition on the date of the petitions</u>.

The Debtors had approximately $158,000 in cash on the day the Debtors' petitions were filed. This cash was held in accounts with Wachovia Bank, N.A. d/b/a Southtrust Bank (the "Wachovia Accounts") and with Amegy.

On the petition date, the Debtors claim to have had accounts receivable of approximately $908,000 that were less than 90-days old. Despite the Debtors' allegations, the Court cannot adequately determine the true amount of the Debtors' accounts receivable. The Court's inability stems from irregularities in the Debtors' accounting procedures. Specifically, the Debtors were unable to offer evidence that their accounting system had properly reduced their accounts receivable for the corresponding cash collections, and the amount of the accounts receivable varied in inexplicable ways. For example, over time, the amount of some accounts receivable that had been listed on previous reports were reduced without a corresponding cash collection. Other accounts receivable were inexplicably increased for work done in prior accounting

periods. Despite these discrepancies, for purposes of this Order, the Court accepts the Debtors' estimates for accounts receivable.

    b. The Debtors' financial condition on April 8, 2005 through April 16, 2005.

Before filing their petitions for relief, the Debtors had issued several checks on their bank accounts totaling approximately $100,000.00 (the "Prepetition Checks"). After filing their petitions, the Debtors did not close their accounts and a number of the checks were paid by Wachovia upon presentment. Although many of the Prepetition Checks were issued to third party vendors, at least two checks (totaling $45,000) were issued to companies affiliated with the Debtors' equity owners.[1]

Due largely to the posting of the Prepetition Checks, the Debtors' cash declined by approximately $106,000 by April 16, 2005. The evidence is ambiguous as to the Debtors' precise postpetition cash balances. The testimony reflects a cash balance of approximately $42,000-$44,000 on April 8, 2005. The written documents reflect a cash balance of approximately $46,000. The Court finds the written documents more persuasive. Accordingly, the Court finds that the Debtors had approximately $46,000 of cash on April 8, 2005. By April 16, 2005, the balance had increased to approximately $52,000.

During this same period (April 5, 2005 through April 16, 2005), the Debtors claim that their accounts receivable increased by approximately $177,000. The Debtors' evidence shows that accounts receivable increased by about $21,000 to reflect an intra-debtor receivable. When questioned about whether all of the third party billings were actually postpetition billings, the Debtors' witnesses testified that they could not bill amounts to the third parties under the third party contracts until postpetition. Nevertheless, the Debtors' representative testified that the

---

[1] While these checks were allegedly issued for pre-petition payroll obligations, the Debtors offered no independent evidence on this matter. Accordingly, the Court makes no finding on the disposition of the funds.

3

internal receivable was not yet billable to a third party.[2] Despite this accounting anomaly, for the purposes of determining compliance with the April 11, 2005 order, the Court accepts the validity of the $21,000 increase in receivables attributed to the internal billing.

c. The Debtors' emergency expenditures.

Exhibit "A" to the Debtors' amended motion for use of cash collateral sets forth $66,444.61 of expenditures that must be made on an emergency basis to allow the Debtors to continue to operate. This amount includes funds for: (i) an insurance payment that the Court previously authorized, (ii) funds for materials needed for ongoing projects, and (iii) funds for prepetition as well postpetition payroll. Based on evidence offered at the hearings, the Court finds the Debtors require these funds to continue to operate. The Court further finds that by any measure, the amount required for emergency expenditures exceeds the Debtors' cash.

## Conclusions of Law

a. Was the Cash Collateral Order Violated?

The Court first addresses the Debtors' Amended Motion to Use Cash Collateral. The Cash Collateral Order was imposed by the Court over Amegy's objection. Pursuant to § 363 of the Bankruptcy Code, the Debtors' use of cash collateral was permitted only if Amegy consented, or if the Court authorized the use. Because Amegy is severely undercollateralized, the Court determined that the Debtors could only spend cash collateral if Amegy was provided adequate protection in postpetition assets. Accordingly, the Court imposed financial covenants against the Debtors. The purpose of the financial covenants was to assure that the Debtors' use of cash collateral was consistent with Amegy's right to adequate protection. The Court further

---

[2] The Court does not believe that the $21,000 provided any actual adequate protection to Amegy. However, the billing of the $21,000 was not inconsistent with prior practice and was not prohibited by the April 11, 2005 Cash Collateral Order.

4

concluded that Amegy had a colorable secured claim in the Wachovia Accounts entitling it to adequate protection under 11 U.S.C. §§ 361 and 363.

This Memorandum adopts the Cash Collateral Order's conclusions and addresses the issues of (i) whether the Cash Collateral Order terminated, and (ii) if the Cash Collateral Order terminated, whether the Court should amend the Cash Collateral Order based on the Debtors' assurance of future adequate protection.

Of relevance to this proceeding, the Cash Collateral Order states that the Debtors' authorization to use the cash collateral "**terminates**" if the "[t]he sum of the Debtors' (i) cash in bank plus (ii) accounts receivable that are less than 90-days old, is less than the Debtors' (i) cash in bank on the petition date plus (ii) accounts receivable that were less than 90-days old on the petition date." [Cash Collateral Order, docket no. 30, ¶6(c) (emphasis added)].

Thus, based on the terms of the Cash Collateral Order, the Debtors' authority to use Amegy's cash collateral would terminate if the Debtors failed to meet any of the covenants listed in the order. Because the Court finds that the Debtors breached sub-paragraph "c", an analysis of the other provisions is not necessary. As set forth in the findings of fact, the Debtors had $158,000 cash in bank and qualified accounts receivable of $908,000 on the date of the filings. Thus, the Court concludes that the minimum measure of Amegy's adequate protection was $1,066,000. Further, as set forth in the findings of fact, the Debtors' had only $46,000 of cash and qualified accounts receivable of $917,000 on April 8, 2005. These amounts total $961,000. Accordingly, as of April 8, 2005, the Debtors had a covenant shortfall (under sub-paragraph (c)) of approximately $105,000. Consequently, by its own terms, the Cash Collateral Order terminated.

The Court notes that the covenant had been breached before the order was entered. This anomaly occurred because the Debtors did not stop the unauthorized payment of the Prepetition

Checks. At the initial cash collateral hearings, the Debtors had asymmetrical knowledge—or at least had such information available to them—regarding the state of their finances. Despite the availability of this information, there was no indication from the Debtors that the Prepetition Checks were being allowed to clear. Indeed, the record reflects that the Debtors believed that the checks had already cleared the bank.

The Debtors cannot and should not be penalized for a violation of the Cash Collateral Order that occurred before entry of the order.[3] The issue is one of adequate protection. Amegy's lien rights do not attach to the Debtors' ledger balances. Their lien rights, if any, attach to the bank account itself. When the Debtors allowed the Prepetition Checks to clear, they did so with Amegy's collateral. Amegy is entitled to adequate protection of its position as it existed on the petition date—that is the measure of its lien rights. The Cash Collateral Order merely set forth a method of measuring that protection. The fact that Amegy's adequate protection failed is a fact that exists independent of the content of the Court's Order. Had the Court been aware that the Prepetition Checks allowed to clear the bank, the Court might not have found that Amegy's position was adequately protected. As discussed above, such information was available to the Debtors at the time of the original hearing. In any event, Amegy's position was not adequately protected when its collateral was used to pay prepetition obligations and no additional collateral was available to protect Amegy's position.

b. Should the Court excuse the Debtors' covenant breach?

The Debtors argue that the Court should suspend their noncompliance of the Cash Collateral Order—thus excusing their covenant breach—because the failure to close the Debtors'

---

[3] Further, this opinion does not imply such willful or knowing disobedience by the Debtors. In this instance, the Court concludes that the Debtors are the unfortunate victims of their own accounting misfortunes.

accounts was inadvertent. The request is without merit. While the Court concludes that the failure to stop payment was not a willful or malicious act intended to defraud creditors, it has nonetheless eroded Amegy's adequate protection. Further, the Court notes that the Debtors did not mitigate their breach by demanding return of the prepetition funds, even though a large portion of the funds were paid to affiliates or insiders of the Debtors.

The Debtors alternatively request that the Court grant the Debtors access to sufficient funds—*i.e.* funds which constitute Amegy's cash collateral—to allow them to cover their emergency operating needs. As noted in the Cash Collateral Order, the burden of proof on adequate protection rests on the Debtors. 11 U.S.C. § 363(o).[4]

Even if the Court were to find that such relief were warranted, and that it was possible to fashion adequate protection to Amegy, the Debtors' collective available cash is simply not capable of funding even its emergency operational needs. Available cash is only about $52,000 while emergency needs total $66,000.

The Debtors argue that they can rapidly collect some of their accounts receivable, thus generating the required cash to pay all necessary expenses. While the Court is less than confident of this proposition, the Debtors' solution ignores the Cash Collateral Order. Under the formula employed in the Cash Collateral Order (sub-paragraph (c)), the collection of accounts receivable results in a reduction of the receivable base exactly equal to the increase in the cash balance. Thus, as of April 16, 2004, even if the Debtors were able to collect all of the accounts receivable and pay the emergency requirements, the Debtors would have been left with only $4,500 over the $1,066,000 adequate protection base protecting Amegy's position.

---

[4] At the initial cash collateral hearing, the Court only required the Debtors to prove that there existed a reasonable possibility of a successful reorganization. *In re Mendoza*, 111 F.3d 1264, 1272 n.3 (5th Cir. 1997) (noting the court must consider the prospects for successful reorganization in making a determination of adequate protection). Because, of the decline in Amegy's adequate protection, and because the Debtors' request to use additional cash collateral is premised on a future increase in accounts receivable, the Court has increased the Debtors' burden to show that there is a reasonable probability of a successful reorganization.

$4,500 is simply not enough available cash to finance operations of this magnitude. The Debtors are operating in chapter 11 on C.O.D. basis. Without a sufficient amount of available cash for day to day operations, the Debtors are certain to fail.

Consequently, the Court concludes that the Debtors have not sustained their burden of proof that their future operations can be undertaken while simultaneously protecting Amegy's interests. Accordingly, the Court concludes that the Cash Collateral Order terminated by its terms, and that the Debtors are unable to fashion adequate protection of Amergy's interest to entitle them to release of the funds necessary for continued operations.

b. <u>Has there been (i) a continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; or (ii) an inability to effectuate a plan</u>?

The Court next addresses Amegy's Motion to Convert. Section 1112(b) contains ten non-exclusive grounds which constitute "cause" to convert a case from chapter 11 to chapter 7. 11 U.S.C. § 1112(b). In determining what constitutes cause, the Court is given broad discretion. 7 COLLIER ON BANKRUPTCY, ¶ 1112.5 (15th Ed. Rev. 2005); *see also, Toibb v. Radloff*, 501 U.S. 157, 165 (1991). However, conversion is a drastic remedy at the early stages of a case. *Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989) ("Decisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly to be made."). Further, in the early stages of a case, the moving party has a significant burden to demonstrate cause. *See In re Minnesota Alpha Foundation*, 122 B.R. 89, 91 (Bankr. D. Minn. 1990).

Amegy requests conversion under 11 U.S.C. § 1112(b)(1) and (2). This section states, in relevant part:

> The court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including--(1) continuing loss to or diminution

8

of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan....

11 U.S.C. § 1112(b).

While the Court recognizes that conversion is a drastic remedy, it does not believe that any less drastic remedy—*i.e.* appointment of an examiner or trustee—would remedy the "cause" necessitating the conversion of this case. The hearings in these cases have been hard fought and contentious. Amegy has made serious allegations against the Debtors' principals, and the Debtors—seemingly unknowingly—have allowed unauthorized prepetition obligations to be paid *inter alia* to insiders. Despite the Debtors' conduct, both actual and alleged, the Court's decision is premised solely on the Court's conclusion that the Debtors' estates are declining in value without prospect of a successful reorganization. As the Court has denied the Debtors' request for its emergency operating funds, the Debtors' continued operations will most certainly cease. In and of itself, such a result dictates that the Debtors' will be unable to reorganize. Further, the appointment of an examiner or a chapter 11 trustee cannot undo the financial turmoil that the Debtors are experiencing.

Consequently, pursuant to 11 U.S.C. § 1112(b)(1) and (2), the Court concludes that cause exists to convert this chapter 11 case to a case under chapter 7.

Signed at Houston, Texas on April 28, 2005.

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE